**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
JANE DOE,

|  |  |
|---|---|
| **Plaintiff,** | **Civil Action No:** 5:17-CV-1163 (DNH/ATB) |
|  | **COMPLAINT** |
| -against- | *Trial by Jury Demanded* |
| **HOBART AND WILLIAM SMITH COLLEGES** |  |
| **Defendant.** |  |

------------------------------------------------------------------X

  **PLAINTIFF JANE DOE**[1] (hereinafter referred to as "Plaintiff"), by her attorneys, Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

## THE PARTIES

  1. At all times relevant to this Complaint, Plaintiff was and is a female citizen of the United States who resides in the State of Connecticut.

  2. At all times relevant to this Complaint, Defendant Hobart and William Smith Colleges (hereinafter "Defendant" or "HWS") was and is a private institution of higher education with its campus located at 300 Pulteney Street, Geneva, New York 11456.

  3. Defendant, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX").

---

[1] Plaintiff files herewith a motion for leave to file under a pseudonym.

4.    For example, upon information and belief, for the years 2015 and 2016, Defendant received approximately $1,834,889.00 and $1,970,841.00, respectively, in government grants and contracts, in addition to the federal student loan money it received. *See* Hobart and William Smith Colleges Financial Statement May 31, 2016 and 2015, available at https://www.hws.edu/offices/business/images/financial_statements2016.pdf (accessed 8/16/2017).

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over Plaintiff's claim(s) based on 28 U.S.C. §§ 1331 and 1332.

6.    Venue is proper in this case pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events which give rise to Plaintiff's claims took place in Ontario County, New York which is located in the Northern District of New York.

## OPERATIVE FACTS AND ALLEGATIONS

### Plaintiff Enrolls at HWS

7.    In or around the Fall of 2016, Plaintiff enrolled at HWS as a freshman student at HWS. Due to her numerous academic achievements, Plaintiff was offered, and accepted, a scholarship to Defendant.

8.    During her freshman year, Plaintiff was assigned to live, and in fact did reside, in HWS' Hirshson residence hall on Defendant's campus. Notably, the Hirshon residence hall was an all-female dormitory.

9.    Plaintiff was eager to begin her education at HWS pursuing a degree in economics. Plaintiff immediately felt at home at HWS and looked forward to continuing her education with Defendant.

**Plaintiff is Raped by One of Defendant's Upperclassmen (the "Assault")**

10.     During her first semester at HWS, Plaintiff decided to celebrate Halloween with her then roommate, C.F. ("Roommate C.F."). As part of the celebration, Plaintiff dressed in a 70's hippie costume and Roommate C.F. dressed in a cruise director costume.

11.     Plaintiff was excited to go out with her friends and celebrate Halloween. Unfortunately, Plaintiff's night would take a horrible turn for the worse.

12.     On the evening of October 29, 2016, Plaintiff and Roommate C.F. went to dinner and decided to spend time together in their dorm room prior to going out on the town to celebrate Halloween.

13.     While at their dorm room, Plaintiff did not consume any alcohol. However, prior to leaving their dorm room, Plaintiff and Roommate C.F. decided to fill a standard 16.9-ounce water bottle approximately three-fourths (¾) full with straight vodka, upon information and belief, Svedka Vodka. The ladies intended to take shots of the vodka from the water bottle throughout the night.

14.     At approximately 9:30 p.m., Plaintiff and Roommate C.F. left their dorm room, vodka filled water bottle in hand, and began to walk to the PSK house, the residence of one of Defendant's fraternities. During the walk to the PSK fraternity house, Plaintiff and Roommate C.F. took turns taking shots of vodka from the water bottle.

15.     Within one hour after having left her dorm room, Plaintiff had consumed, at a minimum, four (4) shots[2] of straight vodka from the water bottle and approximately two (2) twelve-ounce cans of beer at the PSK fraternity house.

---

[2] The average shot of alcohol is 1.5 fluid ounces. As indicated earlier, the water bottle was filled ¾ full with vodka, i.e. was filled with approximately 12.7 ounces of vodka equaling approximately 8.5 shots of vodka. Plaintiff estimates that she consumed, at a minimum, one half of the vodka in the water bottle amounting to approximately four (4) shots of vodka.

16.     As Plaintiff continued to drink and socialize at the PSK fraternity house, she slowly began to feel the effects of her alcohol consumption and, at one point, became nauseous.

17.     Approximately one hour after arriving at the PSK fraternity house, Plaintiff and Roommate C.F. decided to leave and search for an alternative Halloween party. They decided to go to the Soccer House, where Roommate C.F.'s boyfriend lived.

18.     While on the way to the Soccer House, Plaintiff began to significantly experience the negative effects of her alcohol consumption.

19.     Specifically, as indicated above, Plaintiff, a young and petite lady, had consumed, at a minimum, four (4) shots of vodka and two (2) 12-ounce cans of beer within an hour timeframe. Furthermore, while Plaintiff had consumed a meal prior to leaving her dorm room at or around 9:30 p.m., a significant amount of time had elapsed between her last meal and when she commenced taking shots from the water bottle.

20.     Moreover, Plaintiff did not have much experience drinking alcohol prior to her freshman year at HWS and, accordingly, had not built up any sort of tolerance to alcohol prior to the night of October 29, 2016.

21.     As a result of the foregoing circumstances, Plaintiff was suddenly and significantly affected by the volume and pace of her alcohol consumption on the night of October 29, 2016.

22.     Specifically, while she cared for Roommate C.F., Plaintiff herself began to feel sick and experienced dizzy spells, nausea, and feelings of not being in control of her thoughts or physical actions. Plaintiff continued to feel more impaired and inebriated as the night went on.

23.     When Plaintiff and Roommate C.F. arrived to the Soccer House, Plaintiff was almost immediately accosted by one of Defendant's Junior students, John Roe ("Assaulter Roe").

24.     Specifically, after making eye contact with Plaintiff, Assaulter Roe approached her and, after reaching Plaintiff, immediately grabbed onto her and began kissing her. Plaintiff was shocked as she had never before met Assaulter Roe and certainly did not expect to be forced to kiss him without any prior conversation or, especially, her prior consent.

25.     After Assaulter Roe forced Plaintiff to kiss him at the Soccer House, he made several attempts to coerce Plaintiff to accompany him to his bedroom. Assaulter Roe repeatedly asked her to go back to his room with him. Plaintiff repeatedly told him "no."

26.     Plaintiff pleaded with Assaulter Roe to go downtown. Specifically, Plaintiff wanted to go to Beef and Brew, a local restaurant that she had previously frequented.

27.     Upon information and belief, Beef and Brew was a popular location for many of Plaintiff's fellow freshmen students to hang out.

28.     Plaintiff, having just been forced to kiss a stranger and unable to locate Roommate C.F., believed that she would be able to find some of her friends at Beef and Brew, and determined that her safest option was to go somewhere where she was likely to be surrounded by people she knew and trusted.

29.     Plaintiff repeatedly told Assaulter Roe that she wanted to go to Beef and Brew but Assaulter Roe refused to allow her to leave and go downtown. Finally, Assaulter Roe told Plaintiff that he would bring her to Beef and Brew after they made a quick stop to his room.

30.     In her impaired state, Plaintiff understood Assaulter Roe to mean that the pair would briefly drop by his dorm room and then immediately proceed to Beef and Brew.

31.     Although Plaintiff did not want to spend any additional time with Assaulter Roe, in her severely impaired state she understood that she was unable to get to Beef and Brew safely

on her own and believed that accompanied by Assaulter Roe was the only way she would safely reach Beef and Brew and her friends.

32.     Plaintiff agreed to quickly stop by Assaulter Roe's room and then go to Beef and Brew.

33.     As soon as Plaintiff agreed to allow Assaulter Roe to bring her to Beef and Brew, he grabbed Plaintiff by the hand and led her out of the Soccer House.

34.     Throughout her initial interaction with Assaulter Roe, Plaintiff continued to feel the effects of her alcohol consumption, which quickly and strongly affected her senses and ability to process her surroundings. As evidence of her impaired state, Plaintiff sent several text messages throughout the night to several of her friends informing them that she was very drunk and calling out for help.

35.     In her drunken state, Plaintiff was unable to keep up with Assaulter Roe's brisk pace, and upon information and belief, stumbled while attempting to walk with Assaulter Roe due to her alcohol consumption.

36.     Assaulter Roe, upon information and belief sensing Plaintiff's inability to keep up with him, locked arms with Plaintiff, and quickly and forcefully pulled her from the Soccer House to his room.

37.     Plaintiff recalled very little from the walk from the Soccer House to Assaulter Roe's room, as the effects of her alcohol consumption began to significantly distort her senses.

38.     Plaintiff was obviously and outwardly incredibly intoxicated as she was unable to support herself and required assistance from Assaulter Roe to walk any distance.

39.     When Assaulter Roe and Plaintiff reached his room, Assaulter Roe quickly and without warning removed all of his clothing and put on a condom.

40.     Upon seeing Assaulter Roe stripped naked, Plaintiff became increasingly confused and scared as she had never meant nor suspected that the pair were going to engage in any sort of sexual contact. Plaintiff remained clothed standing in Assaulter Roe's doorway.

41.     Upon information and belief, as a result of the amount of alcohol Plaintiff had consumed that night, coupled with the short time frame in which said alcohol was consumed and Plaintiff's small stature, Plaintiff blacked out from being too drunk.

42.     The next thing Plaintiff knew, she was naked on her back on Assaulter Roe's bed with him on top of her. Plaintiff did not recall removing her clothing or getting on the bed.

43.     Assaulter Roe had vaginally penetrated Plaintiff with his penis and was having sex with Plaintiff.

44.     Plaintiff recalls regaining consciousness and realizing what was happening to her. Plaintiff was bewildered as at no point throughout that night did she, in any way, manifest her consent to engage in any sexual act with Assaulter Roe.

45.     Plaintiff was so shocked and scared at what was happening to her, it was as though she were paralyzed - unable to move her limbs, which felt heavy and limp, and stop what Assaulter Roe was doing to her.

46.     Plaintiff remained stock still and silent as Assaulter Roe continued to vaginally penetrate her and have sex with her without Plaintiff's either implied or explicit consent.

47.     On at least two occasions during this ordeal, Plaintiff felt Assaulter Roe withdraw and it appeared as though he were attempting to remove the condom he had earlier put on. Plaintiff felt a jolt of adrenaline and used these opportunities to try and stop the assault. Plaintiff sat up and told Assaulter Roe "No, No."

48.     After the first time Plaintiff told Assaulter Roe "no," instead of listening to Plaintiff's clear manifestation of her non-consent, Assaulter Roe placed the condom back onto his penis and once again vaginally entered Plaintiff.

49.     After the second time Plaintiff told Assaulter Roe "no," it appeared as though Assaulter Roe was again going to ignore her pleas to stop the assault.

50.     Realizing that she was in danger and not knowing what Assaulter Roe was capable of doing to her, Plaintiff believed that the only safe way out of her situation was if Assaulter Roe got what he wanted – i.e. he was able to ejaculate.

51.     Plaintiff knew that what was happening was wrong and wanted to escape from Assaulter Roe's room as quickly and safely as possible.

52.     Believing that it was her safest option, and in fact the only way to end this horrible experience quickly and without further physical trauma, Plaintiff performed oral sex on Assaulter Roe in order to make him ejaculate.

53.     Plaintiff, who was not sexually active and not on any birth control at the time, felt doing so was her least risky option.

54.     Assaulter Roe ejaculated in Plaintiff's mouth.

55.     As soon as Assaulter Roe ejaculated, Plaintiff, as quickly as she was able in her still alcohol-impaired state, shot up from his bed and searched for her clothes.

56.     While Plaintiff was searching for her clothing and attempting to quickly dress herself, Assaulter Roe snidely asked Plaintiff "do you even know my name?" This was the first time Plaintiff recalled Assaulter Roe ever saying anything to her after they reached his dorm room.

57.     Plaintiff replied that she did not know Assaulter Roe's name, because, in fact, she did not. In response, Assaulter Roe appeared disgusted and said "HOW DO YOU NOT KNOW **MY** NAME?"

58.     Plaintiff felt embarrassed as though she was somehow guilty of not knowing who her rapist was. Assaulter Roe, after already stripping Plaintiff of her dignity by sexually assaulting her, only added salt to the wound by shaming Plaintiff for their non-consensual sexual encounter.

59.     Plaintiff went to leave Assaulter Roe's room. Before she was able to leave, Assaulter Roe stopped Plaintiff and told her "Okay, now go back to your room and don't hook up with anyone else tonight."

60.     Plaintiff was confused by this statement as she and Assaulter Roe had not "hooked up." Rather, Assaulter Roe had raped Plaintiff and, in Plaintiff's opinion, was continuing to exert his power over her by making demands of her even after she left his room.

**Assaulter Roe Stalks Plaintiff**

61.     On or about December 3, 2016, Plaintiff and her friend M.B. ("Friend M.B.") were socializing at Beef and Brew with a number of other classmates. Although Beef and Brew served alcohol and her friends were drinking, Plaintiff did not consume much alcohol throughout the night.

62.     At one point in the night, Plaintiff felt as though she were being watched. When Plaintiff looked around, she immediately saw Assaulter Roe was also at Beef and Brew, was only a few feet away from her and her friends, and was staring directly at her.

63.     Alarmed, Plaintiff immediately excused herself into another room at Beef and Brew. Less than one minute later, Plaintiff looked up and saw Assaulter Roe had followed her into the second room at Beef and Brew and was once again staring at her.

64.     Plaintiff was immediately fearful and again excused herself to return to the first room at Beef and Brew. Assaulter Roe continued to follow Plaintiff from room to room at Beef and Brew.

65.     Suddenly, Assaulter Roe was against Plaintiff. Although there were multiple paths to take throughout the establishment, Assaulter Roe intentionally walked in Plaintiff's direction and, upon reaching her, walked behind her and rubbed his genital area against Plaintiff's buttocks.

66.     In her mind, Plaintiff was transported back to the night of the Assault and immediately felt sickened.

67.     Plaintiff raced outside of Beef and Brew and burst into tears crying. Plaintiff called Roommate C.F. and had a brief conversation with her about the night's events before Friend M.B. found Plaintiff outside and tried to calm Plaintiff down. Friend M.B. eventually coaxed Plaintiff to go back inside Beef and Brew.

68.     Once back inside, however, Plaintiff could still sense Assaulter Roe staring at her and at one point, saw Assaulter Roe again intentionally moving towards her. Assaulter Roe attempted to cut through Plaintiff's friends to reach Plaintiff. Upon seeing this, Plaintiff grabbed Friend M.B. and left as quickly as she could.

69.     Plaintiff, feeling great discomfort, left Beef and Brew so as not to have to encounter Assaulter Roe again.

**Plaintiff Contacts Defendant's Title IX Office and**
**Learns About HWS' Sexual Misconduct Policy (the "Policy")**

70.     In or around the end of November 2016, Plaintiff received a call from Friend

M.B. who informed Plaintiff that she was at Defendant's Title IX Office and had spoken to one

of the employees there regarding Plaintiff's Assault.

71.     Although Plaintiff was reluctant to speak about the Assault out of fear of having

to admit she was a sexual assault victim, Plaintiff decided to meet Friend M.B. at HWS' Title IX

Office. While there, Plaintiff spoke to a representative about the process of filing a Title IX

Complaint and the potential avenues for relief available to Plaintiff should she decide to file a

Title IX Complaint.

72.     Plaintiff learned that Defendant's Sexual Misconduct Policy provided as follows:

**I.      Defendant's Statement of Intent**

73.     In its introduction, the Policy provides, in relevant part:

> [HWS] specifically prohibit[s] … Sexual Assault [ ].
>
> [HWS] respond[s] promptly and equitably to reports of Sexual
> [Assault] to eliminate [Sexual Assault], prevent its recurrence, and
> address its effects. [HWS] … take[s] disciplinary action against
> students, faculty and staff found to be in violation of this Policy.
> Disciplinary action for violations of this Policy may include
> expulsion of a student or termination of a faculty or staff member.

**II.     Defendant's Definition of Sexual Assault**

74.     The Policy defines "Sexual Assault" as"

> [H]aving or attempting to have sexual intercourse or sexual
> contact with another individual without Affirmative Consent.
> Sexual intercourse is any vaginal … penetration, however slight …
> with a penis … performed by an individual upon another
> individual. Sexual intercourse also includes any contact, however
> slight, between the mouth of one individual and the genitalia of
> another individual.

75.     The Policy defines "Affirmative Consent", in relevant part, as:

> [A] knowing, voluntary, and mutual decision among participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent.
>
> Affirmative Consent cannot be obtained by taking advantage of the incapacitation of another individual where the person initiating sexual activity know or reasonably should have known that the other was incapacitated. Incapacitation is a state where an individual cannot make an informed and rational decision to engage in sexual activity. An individual is incapacitated if the individual lacks conscious knowledge of the nature of the act or is physically helpless, asleep, unconscious, or otherwise unaware that sexual activity is occurring. An individual may be incapacitated as a result of the consumption of alcohol or other drugs...
>
> Common and obvious warning signs can show that a person may be incapacitated or approaching incapacitation.
>
> In general, sexual contact while under the influence of alcohol … poses a risk to all parties. Alcohol … impair[s] a person's decision-making capacity, ability to communicate clearly, awareness of the consequences, and ability to make informed judgments. Individuals engaging in sexual activity should continually evaluate [c]onsent throughout the encounter. An individual who does not initially appear to be incapacitated may become incapacitated as the effects of alcohol or other drugs increase. [ ] Being impaired by alcohol … is not a defense to a violation of this Policy.

76.     With respect to obtaining Affirmative Consent, the Policy provides, in relevant part:

> A person who wants to engage in a specific sexual activity is responsible for obtaining Affirmative Consent for that activity. Silence and/or passivity do not constitute [c]onsent. Lack of resistance does not constitute [c]onsent. Consent is active, not passive…

- All parties must demonstrate a clear and mutual understanding of the nature and scope of the act to which they are consenting and a willingness to do the same thing, at the same time, in the same way.
- Consent may be withdrawn by any party at any time. An individual who seeks to withdraw Affirmative Consent must communicate, through clear words or action, a decision to cease the sexual activity. Once consent is withdrawn, the sexual activity must cease immediately and all parties must obtain mutually expressed or clearly stated consent before continuing further sexual activity.

### III.  Defendant's Definition of Stalking

77.     The Policy defines "Stalking", in relevant part, as follows:

> Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear for the person's safety or safety of others or to suffer substantial emotional distress.

### IV.  Plaintiff's Bill of Rights Under the Policy

78.     Defendant's Policy includes a Student Bill of Rights (the "Student BOR") which applied to Plaintiff as she was a student of HWS.

79.     With respect to complaints of sexual assault, HWS' Student BOR provided, in relevant part, as follows:

> All [HWS] students have the right to
>
> - Make a report (or decline to report) to local law enforcement and/or state police;
> - Have disclosures of Sexual Assault … treated seriously;
> - Make a decision about whether or not to disclose a crime or violation and participate in the complaint resolution process and/or criminal justice process free from pressure by the institution;
> - Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard;

- Be treated with dignity and to receive from [HWS] courteous, fair, and respectful health care and counseling services, where available;
- Be free from any suggestion that the Complainant is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations;
- Describe the incident to as few HWS representatives as practicable and not be required to unnecessarily repeat a description of the incident;
- Be protected from retaliation by [HWS], any student, the Respondent, and/or their friends, family and acquaintances within the jurisdiction of HWS;
- Access to at least one level of appeal of a determination;
- Be accompanied by an advisor who may assist and advise a Complainant or a Respondent during any meetings and hearings under this Policy and procedures; and
- Exercise civil rights and practice of religion without interference by the investigative, criminal justice, or complaint resolution process of [HWS].

**V.      Reporting Sexual Assault Under the Policy**

80.      The Policy states, in relevant part:

> [HWS] encourage[s] individuals who have experienced, have knowledge of, or have witnesses [Sexual Assault or Stalking] to make a report to [HWS]. Under Title IX, once an institution has notice of an act of [Sexual Assault or Stalking], it is required to (1) take immediate and appropriate steps to investigate or otherwise determine what occurred; and (2) take prompt and effective action to end any misconduct that occurred; remedy its effects; and prevent its recurrence.

**VI.     Defendant's Procedures Immediately After a Report of Sexual Assault is Made**

81.      With respect to the procedures and policies guiding the investigation and adjudication of any report of [Sexual Assault or Stalking], the Policy provided as follows:

A.  Intake Assessment

Upon receipt of a report of [Sexual Assault or Stalking], the Title IX Coordinator (at HWS the Title IX Coordinator was Susan Lee ("Coordinator Lee")) will make an initial assessment of the reported information and respond to any immediate safety and well-being concerns raised by the report.

B.  Determination of [HWS'] Response Following Intake Assessment

Following the Intake Assessment, the Title IX Coordinator will promptly evaluate every report of [Sexual Assault or Stalking] and review new information as it becomes available. The Title IX Coordinator will review all known information about the reported incident of [Sexual Assault or Stalking].

The Title IX Coordinator will determine whether the reported information and any other available information provides a reasonable basis for concluding that there is a threat to the safety or well-being of the Complainant or to the HWS community.

Upon completion of the safety and well-being assessment, the Title IX Coordinator will determine the course of action, which may include but is not limited to formal Resolution and/or Informal Resolution (if available).

C.  Where the Complainant Wishes to Pursue Formal or Informal Resolution

In every case in which the Complainant reports [Sexual Assault or Stalking] and requests an investigation and disciplinary action, the Title IX Coordinator will promptly initiate Formal Resolution if, taking all known information as true, the report would constitute a violation of the Policy.

VII.  **Defendant's Procedures for Resolving Complaints of Sexual Assault Made Against an HWS Student**

82.   As explained to Plaintiff during her first interaction with Defendant's Title IX Office, HWS instituted a series of procedures for resolving claims of sexual misconduct, in

Plaintiff's case sexual assault and stalking, which are brought against a fellow HWS student (the Procedures"). The Procedures were codified in Defendant's Appendix A to the Policy.

83.     Pursuant to the Procedures, the investigative process is a "neutral fact-gathering process." Further, while participation by all parties may be favored, pursuant to the Procedures, "[n]either party is required to participate in the investigation or any form of resolution under these Procedures, and the adjudicator(s) will not draw any negative inference from a decision by either of the parties not to participate.

84.     After Formal Resolution is commenced, the Title IX Coordinator will "designate one or more Investigators from [HWS] and/or an experienced external investigator to conduct a prompt, thorough, fair, and impartial investigation."

85.     Further, the Title IX Coordinator will

> [N]otify the Complainant and Respondent, in writing, of the commencement of an investigation. Such notice will (1) identify the Complainant and Respondent; (2) specify the date, time (if known), location, and nature of the alleged [Sexual Assault or Stalking]; (3) identify potential Policy violation(s); (4) identify the Investigator; (5) include information about the [Student BOR]; (6) inform the parties of the rights to choose and consult with an [a]dvisor, who can accompany the parties to any meeting or hearing under the Policy and Procedures; (7)explain the prohibition against Retaliation; (8) instruct the parties to preserve any potentially relevant evidence in any format; (9) inform the parties how to challenge participation by the Investigator on the basis of bias or a conflict of interest; and (10) provide a copy of the Policy and these Procedures.

86.     Further, Defendant's Procedures provided that "[t]he investigation typically will be completed within thirty (30) calendar days. This period may be extended … for [ ] good cause. [ ] Any extension, other than for Informal Resolution, and the reason for the extension, will be shared with the parties in writing."

87.     Further, the Procedures provide that during the investigation:

> [T]he parties will have an equal opportunity to be heard, to submit information and corroborating evidence, to recommend witnesses who may have relevant information, and to submit questions that they believe should be directed by the Investigator to each other or to any witness. The Investigator will notify and seek to interview separately the Complainant, the Respondent, and third-party witnesses, and will gather other relevant and available evidence and information…

88.     At the conclusion of the investigation, as per the Procedures, the Investigator would prepare a preliminary investigative report, which the Complainant and Respondent will be able to review, respond to in writing, and submit additional comments and information.

89.     Thereafter, within seven (7) calendar days after receipt and consideration of any comments from either Complainant or Respondent to the Preliminary Investigative Report, the Investigator will prepare a Final Investigative Report and deliver said report to the Title IX Coordinator. The Title IX Coordinator will thereafter notify both parties that the Final Investigative Report is complete and available for review.

90.     Finally, following the Final Investigative Report, the Procedures provide that "a Hearing will be held within forty-five (45) calendar days from the date of the Notice of Investigation, subject to extension for good cause." The Procedures further provided that "the period from commencement of an investigation through resolution (finding and sanction, if any) will not exceed sixty (60) calendar days[,]" a time frame consistent with the strictures of Title IX.

91.     If a student is found to have violated the Policy after a complaint is adjudicated, as per the Procedures, HWS was to issue a sanction up to and possibly including expulsion, and

make a notation on the Respondent's transcript which read "suspended (or expelled) after a finding of responsibility for a code of conduct violation."

**Plaintiff Files Title IX Complaints with Defendant**

92.     On or about December 18, 2016, after reviewing the aforementioned Policy and Procedures, and conferring with her family about her options and her best course of action, Plaintiff decided to file formal complaints against Assaulter Roe.

93.     Plaintiff contacted Coordinator Lee to do so and thereafter filed two formal complaints of sexual assault and one formal complaint of stalking (the "Title IX Complaints") with Defendant's Title IX office.

94.     When Plaintiff contacted Coordinator Lee, she participated in a phone interview, together with her mother. Plaintiff described to Coordinator Lee the events which took place on the night of October 29, 2016, the Assault, and the subsequent incident of stalking. Coordinator Lee confirmed to Plaintiff that the investigation (the "Title IX Investigation") began that day – December 18, 2016.

95.     Thereafter, on or about December 23, 2016, Plaintiff, together with her mother, participated in an interview via Skype with Laura Harshbarger, the investigator assigned to Plaintiff's complaint ("Investigator Harshbarger").

96.     Upon information and belief, following Plaintiff's December 23, 2016 Skype interview, Defendant sent Assaulter Roe a "No Contact Order" in connection with Plaintiff's Title IX Complaints.

**HWS Puts Pressure on Plaintiff Under the Guise**
**of Promptly Investigating her Title IX Complaints**

97.     Following her Skype interview with Investigator Harshberger, Plaintiff was asked to provide additional information and documents to Defendant in furtherance of the Title IX Investigation.

98.     Despite being on Christmas vacation, Defendant demanded that all requests were promptly satisfied, frequently giving Plaintiff less than one day to provide additional documents and information.

99.     By way of example only, Plaintiff was contacted one morning during her Christmas vacation in New York City and asked to provide her cell phone records. Plaintiff was only afforded until the end of that same day to provide such records.

100.    Plaintiff understood Defendant's urgency to mean that they were handling her Title IX Complaints seriously and were dedicated to promptly and fully concluding the Title IX Investigation.

101.    Plaintiff cooperated with every request as quickly as she was able and provided all necessary and requested information to Defendant in a prompt manner.

**Defendant Encourages Plaintiff to Leave HWS**
**While the Title IX Investigation is Allegedly Ongoing**

102.    As a result of the Assault, Plaintiff suffered tremendous emotional trauma. Plaintiff found herself forever altered.

103.    Plaintiff fell into a deep depression and lived in fear of ever running into Assaulter Roe on campus. As a result of the trauma she suffered and the debilitating fear she faced while enrolled at HWS, Plaintiff was unable to perform at the same academic level as she had previously. As a result, Plaintiff's grades began to slip.

104.    Defendant suggested that Plaintiff take a medical leave of absence for the Fall 2016 semester and offered to invalidate all of Plaintiff's grades for the Fall 2016 semester so long as she decided to take the leave prior to the release of her final Fall 2016 grades. Plaintiff declined this offer. Thereafter, Coordinator Lee suggested that Plaintiff take a medical leave of absence for both the Spring 2017 and Fall 2017 semesters.

105.    Determining that it was her best and safest option, Plaintiff took a medical leave of absence for the Spring 2017 semester. Plaintiff's parents visited HWS on or about January 9, 2017, to move Plaintiff back home to Connecticut.

**In Plaintiff's Absence, Defendant Intentionally Delays**
**The Investigation and Adjudication of Plaintiff's Title IX Complaints**

106.    As discussed *supra,* Plaintiff ensured that she complied with all of Defendant's requests for information and documents in a prompt and timely manner. Defendant had everything it had requested of Plaintiff by the end of December 2016.

107.    Despite promptly receiving everything Defendant had requested from Plaintiff, Defendant waited weeks before it paid any attention at all to Plaintiff's Title IX Complaints.

108.    Upon information and belief, with Plaintiff officially de-enrolled as a student for the Spring 2017 semester, Defendant believed it could get away with ignoring Plaintiff's Title IX Complaints.

109.    Indeed, it was not until approximately January 31, 2017, more than four weeks after Plaintiff's filed her Title IX Complaints, that Defendant began contacting witnesses and scheduling additional interviews.

110.    Defendant attempted to blame this delay on HWS' winter break. However, Defendant's winter break concluded on or about January 17, 2017, and Defendant offered no

further explanation as to why no witnesses were contacted or interviewed between January 17, 2017 and January 31, 2017.

111.    In the meantime, Assaulter Roe was permitted to continue attending HWS without consequence or any requirement to participate in the Title IX Investigation for months. Indeed, it was appallingly not until February 10, 2017 that Investigator Harshbarger finally interviewed Assaulter Roe.

112.    In the time between Plaintiff submitting the Title IX Complaints (December 18, 2016) and Assaulter Roe's interview with Investigator Harshbarger (February 10, 2017), Plaintiff and her family made several inquiries to Coordinator Lee asking for the status of the Title IX Investigation.

113.    By way of example only, Plaintiff and/or members of her family contacted Defendant on the following occasions:

a.   Plaintiff's mother contacted Coordinator Lee by email on January 9, 2017 (three weeks after Plaintiff's Title IX Complaints) advising that she and her husband would be on Defendant's campus that day to move Plaintiff back home, and asking if there was anything else needed from Plaintiff or her parents for the Title IX Investigation;

b.   On January 9, 2017 (three weeks after Plaintiff's Title IX Complaints), Plaintiff's parents met with Coordinator Lee at her office at HWS. Plaintiff's parents inquired as to the procedures and status of the Title IX Investigation, and again offered to assist in the Title IX Investigation in any way they could. Coordinator Lee indicated Defendant did not need anything further and would be pressing on with the Title IX Investigation;

c.   On January 24, 2017 (five weeks after Plaintiff's Title IX Complaints), after hearing nothing back from Defendant regarding Plaintiff's Title IX Complaints, Plaintiff contacted Coordinator Lee via telephone to inquire as to the status of the Title IX Investigation. At such time, Plaintiff was advised that despite the five-week lapse in time, neither Assaulter Roe nor any witnesses had been interviewed yet, and was nonchalantly informed that HWS was going to take more than the required sixty (60) days to investigate, despite Defendant's Policy, Defendant's Procedures, and Title IX guidelines. Plaintiff was given no sufficient justification for the delay. In addition, Plaintiff inquired as to why Defendant had not interviewed Assaulter Roe via Skype, as Plaintiff had been asked to do, and why there was no longer the same sense of urgency to interview Assaulter Roe as there had been to interview her. In response, Coordinator Lee merely told Plaintiff and her parents, in essence, not to worry about it.

d.   On January 25, 2017 (five weeks after Plaintiff's Title IX Complaints), Plaintiff's mother contacted Coordinator Lee via email to confirm her conversation with Plaintiff, share her concerns regarding the delay in the Title IX Investigation, and inquire as to (i) the process moving forward and (ii) Defendant's policy on keeping the complainant (Plaintiff) and complainant's family updated. In response, Coordinator Lee would only speak to Plaintiff and her parents via telephone, upon information and belief, so as to avoid a paper trail of their communications. Coordinator Lee gave Plaintiff and her parents a litany of excuses for why Defendant

had *still* not pursued Plaintiff's Title IX Complaints, none of which were adequate.

e. On February 1, 2017 (six weeks after Plaintiff's Title IX Complaints), Plaintiff's mother again reached out to Coordinator Lee to inquire as to the status of the Title IX Investigation and Defendant's ability to schedule Assaulter Roe's interview which **still** had not taken place;

f. On February 6, 2017 (seven weeks after Plaintiff's Title IX Complaints), Plaintiff's mother again reached out to Coordinator Lee to politely relay her numerous concerns regarding the sluggish progress of the Title IX Investigation, and the concern that the process had been intentionally delayed due to Assaulter Roe's father's status as an alumnus of HWS. Again, Coordinator Lee responded with the same excuses to justify Defendant's obvious reluctance to pursue and adequately investigate Plaintiff's Title IX Complaints.

114.   On or about February 10, 2017 (seven weeks after Plaintiff's Title IX Complaints), Defendant finally interviewed Assaulter Roe.

115.   Pursuant to Defendant's Policy, Defendant's Procedures, and implementing Title IX guidance and regulations, Plaintiff's Title IX Complaints were to be fully investigated and adjudicated within sixty (60) days, i.e. on or before February 16, 2017.

116.   However, as of February 16, 2017 (eight weeks after Plaintiff's Title IX Complaints), HWS had only accomplished the following:

a.   Plaintiff's interview;

b.   Assaulter Roe's interview; and

      c.   Interviews of five (5) out of twenty-four (24) third party witnesses.

117.   Defendant offered no viable justification for the undue delay of the Title IX Investigation.

118.   While Defendant dragged its feet to investigate Plaintiff's Title IX Complaints, Assaulter Roe was permitted to remain as a student at HWS while Plaintiff, utterly distraught over what had happened to her and Defendant's lack of interest in helping her, was forced to leave Defendant for her own health and safety.

119.   Despite her absence from Defendant's campus, Assaulter Roe still found ways to plague Plaintiff, as his friends – men Plaintiff had previously had no contact with – began to follow her on social media websites.

120.   Upon information and belief, Assaulter Roe requested his friends keep track of Plaintiff in order to gain intel on Plaintiff without directly violating the No Contact Order.

121.   Plaintiff alerted Defendant and Investigator Harshberger about this troubling conduct but to no avail – nothing was done to stop Assaulter Roe's friends from following Plaintiff. Upon information and belief, Assaulter Roe was not even asked about such events.

**Defendant Finally Issues A**
**Preliminary Investigative Report…Four Months Later**

122.   On or about February 14, 2017, just a few days shy of when the investigation and adjudication of Plaintiff's Title IX Complaints were supposed to conclude, Coordinator Lee advised Plaintiff and her family that they would **not** receive a preliminary investigative report until approximately March 6, 2017, a staggering eleven weeks after Plaintiff filed the Title IX Complaints.

123.   As it turned out, Defendant would not even meet the already belated March 6, 2017 target date. Indeed, on or about March 6, 2017, after nearly another month without any

contact from Defendant, Plaintiff reached out to Coordinator Lee to inquire as to the status of any preliminary investigative report and determine the schedule for the remainder of the Title IX Investigation.

124.   In response, Coordinator Lee set up a call with Investigator Harshberger for March 9, 2017.

125.   Coordinator Lee further advised that an adjudicator for the eventual hearing to adjudicate Plaintiff's Title IX Complaints, which should have been completed on or before February 16, 2017, had been selected and that the date for the hearing would be April 12, 2017 (sixteen weeks after Plaintiff's Title IX Complaints).

126.   Coordinator Lee then confirmed that Plaintiff would **not** receive a preliminary investigative report until March 31, 2017 (fourteen weeks after Plaintiff's Title IX Complaints).

127.   On or about March 9, 2017, Plaintiff participated in the scheduled phone call with Investigator Harshberger.

128.   During the call with Investigator Harshberger, which lasted approximately three (3) hours, Plaintiff was again forced to relay the story of her rape all the while being interrogated by an obviously biased investigator.

129.   Indeed, as Plaintiff retold her story, Investigator Harshberger repeatedly questioned the credibility of Plaintiff's story, insinuated that Plaintiff was compliant and open to Assaulter Roe's "advances", and repeatedly asked Plaintiff the same questions to, upon information and belief, get Plaintiff to change her story in order to better match Assaulter Roe's retelling of the Assault.

130.   Thereafter, Plaintiff waited to receive a preliminary investigative report by March 31, 2017. However, Defendant did not bother to issue a preliminary investigative report (the

"Preliminary Report") until approximately April 10, 2017 – sixteen weeks after Plaintiff submitted her Title IX Complaints, eight weeks after Defendant's deadline to fully investigate and adjudicate Plaintiff's Title IX Complaints had expired, and a mere two days before the scheduled hearing, ensuring that the hearing could not feasibly take place as promised.

131.    Notably, the Preliminary Report was rife with evidence noting Assaulter Roe's guilt including, but not limited to, his own inconsistent statements and implausible retelling of the events which took place on October 29, 2016, as well as statements from witnesses corroborating Plaintiff's intoxication and cries for help.

132.    Most jarring, the Preliminary Report included admissions from at least one witness that Assaulter Roe directed her to lie on his behalf when questioned by Investigator Harshberger. Such admission was made months earlier, in February of 2017, to Investigator Harshberger. Thus, Defendant was on notice of Assaulter Roe's dishonest and deliberate attempts to misrepresent what occurred on the night of the Assault and continued to allow him to remain on campus without consequence.

133.    Plaintiff timely highlighted this evidence from the Preliminary Report to Investigator Harshberger and Coordinator Lee.

**Plaintiff Is Forced to Plead for a Hearing Date**

134.    Following Plaintiff's review of the Preliminary Report, Plaintiff was advised that Defendant would review her comments, as well as those of Assaulter Roe, issue a final investigatory report, and, "if necessary", hold a hearing (the "Prospective Title IX Hearing"). This was odd as the hearing was already scheduled for April 12.

135.    As it would turn out, Defendant cancelled the April 12, 2017 hearing date and proposed the following alternative dates to hold the Prospective Title IX Hearing: April 17, April 24, April 27, and April 28.

136.    Plaintiff contacted Coordinator Lee and advised that she, her parents, and her advisor were available to participate in the Prospective Title IX Hearing on the suggested April 24 date and that, due to a number of scheduling conflicts, the proposed April 27 and 28 dates were not available. At Coordinator Lee's behest, Plaintiff held the April 24 date anticipating the Prospective Title IX Hearing would go forward on that day.

137.    Despite advising Defendant that all necessary persons were only available on April 24, Defendant chose instead to schedule the Prospective Title IX Hearing for April 28, based entirely on Assaulter Roe's availability.

138.    Defendant already knew that these dates were not available for Plaintiff, her family, or her advisor, but went ahead and scheduled the Prospective Title IX Hearing anyway. Upon information and belief, Defendant was only concerned for Assaulter Roe's availability and convenience.

139.    Plaintiff immediately reminded Defendant that not only was she incredibly alarmed with the second unilateral rescheduling of the Prospective Title IX Hearing, but was also not available on the April 28 date.

140.    Coordinator Lee seemed annoyed that Plaintiff had complained of the date for the Prospective Title IX Hearing and threatened that if Plaintiff did not make the date chosen for Assaulter Roe work, the Prospective Title IX Hearing would have to been pushed out even further into May 2017, and it would be entirely Plaintiff's fault.

141.    Defendant showed a blatant lack of regard or sympathy for Plaintiff and entirely failed to hide its preference towards Assaulter Roe.

142.    Coordinator Lee insisted that the Prospective Title IX Hearing go forward on April 28, and further suggested that it did not matter if Plaintiff or her advisor could not attend the Prospective Title IX Hearing to adjudicate Plaintiff's own Title IX Complaint.

143.    Coordinator Lee suggested that Plaintiff and her advisor simply participate remotely, with no assurances that such was even possible. Coordinator Lee further emphasized that it was very important to Defendant that the respondent (Assaulter Roe) and his advisor be able to attend and that it would not be fair to schedule the Prospective Title IX Hearing on a date when he was unavailable – such concern was not similarly extended to Plaintiff, the victim.

144.    Alarmed by Defendant's lack of empathy and understanding, and noted bias in favor of Assaulter Roe, Plaintiff and her advisor, at great expense, changed their respective schedules AGAIN and confirmed that they would not miss the Prospective Title IX Hearing.

145.    Accordingly, the Prospective Title IX Hearing was scheduled to proceed on April 28, 2017 – eighteen weeks after Plaintiff's Title IX Complaints.

**Defendant Allows Assaulter Roe to**
**Withdraw from HWS Unscathed at the Last Minute**

146.    Approximately three days short of the Prospective Title IX Hearing, after Plaintiff had spent weeks preparing her case and significant resources and expenses in coordinating her attendance (and the attendance of her advisor and family) at the Prospective Title IX Hearing, Plaintiff was shockingly informed that Assaulter Roe had withdrawn as a student from HWS, and Defendant was refusing to move forward with Plaintiff's Title IX Complaints.

147.    Defendant informed Plaintiff that as a result of Assaulter Roe's withdrawal, the entire Title IX process would cease immediately and Plaintiff's Title IX Complaints would be

deemed closed, despite the fact that no final investigative report had been issued and the Prospective Title IX Hearing was never held.

148.    As a consolation prize, Plaintiff was told that instead of having the proper notation on his transcript, Assaulter Roe's academic transcript would only read "withdrew with conduct charges pending." Assaulter Roe would also have the ability to return to Defendant's campus again under certain circumstances.

149.    Defendant purportedly based its decision to close Plaintiff's complaint and the adjudicatory process on Defendant's Procedures which provided, in relevant part:

> WITHDRAWAL PENDING OUTCOME
>
> The Title IX Coordinator will direct [HWS]'s Registrar to make a notation on the academic transcript of any student who withdraws from [HWS] while under investigation for [Sexual Assault and Stalking]. The transcript will indicate "withdrew with conduct charges pending" where a Respondent chooses to withdraw from [HWS] prior to the conclusion of a Formal Resolution. Students who withdraw while conduct charges are pending may not apply for readmission to [HWS].

150.    Defendant's excuse for prematurely closing out Plaintiff's Title IX Complaints was entirely meritless. Firstly, Defendant's own Policy and Procedures provided that neither party – complainant (Plaintiff) or respondent (Assaulter Roe) – were required to participate in the investigatory and adjudicatory process for it to move forward. Title IX similarly does not have any such requirement.

151.    Further, Defendant's quick and "final", as Coordinator Lee deemed it, decision to terminate the Title IX Investigation and cancel the Prospective Title IX Hearing due to Assaulter Roe's withdrawal stood in stark contrast to Defendant's treatment of Plaintiff.

152.    Indeed, Plaintiff was similarly not a student of Defendant's during much of the Title IX Investigation nor at the time of the Prospective Title IX Hearing. When Plaintiff indicated that she could not attend the Prospective Title IX Hearing, however, she was blamed for delaying the process and offered, essentially, three options – (i) participate remotely, (ii) find a way to be there, or (iii) not attend and live with the outcome.

153.    Plaintiff was utterly shattered by Defendant's unlawful and unjustified decision to throw her Title IX Complaints to the side.

154.    Throughout the entire Title IX process, from the filing of her Title IX Complaints to the closing of the Title IX Investigation and cancellation of the Prospective Title IX Hearing, Defendant showed a blatant favoritism towards Assaulter Roe and bent over backwards to make sure the process was as fair and convenient and advantageous for him over Plaintiff as possible.

**Plaintiff is Left in Shambles**

155.    As a direct and foreseeable result of the Assault and Defendant's refusal to offer Plaintiff any meaningful support, Plaintiff found it impossible to return to Defendant's campus again.

156.    Plaintiff was made to feel ashamed of what had happened to her, and felt absolutely helpless as at seemingly every step, Defendant failed to put her needs first in favor of making things easier for her rapist.

157.    Assaulter Roe intentionally sexually assaulted Plaintiff, and in the process humiliated, degraded, and violated her, thereby robbing her of her dignity, and causing her severe emotional distress and lifelong damage.

158.    Adding insult to injury, as outlined above, Defendant intentionally placed Plaintiff's Title IX Complaints on the proverbial back burner, forcing Plaintiff and her family to

repeatedly plea for help. Meanwhile, Assaulter Roe was permitted to continue living on campus and attending Defendant as a student, seemingly without any consequences. Moreover, Assaulter Roe was permitted to find new ways to stalk and harass Plaintiff without consequence.

159.    Defendant made every accommodation for Assaulter Roe and, in the end, permitted him to gracefully bow out of the Title IX process unscathed.

160.    Defendant's behavior was malicious, unjustifiable, willful, outrageous, and conducted with full knowledge of the law.

161.    Accordingly, Plaintiff was unable, in good conscience and good health, to return to HWS following the Spring 2017 semester.

162.    As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered significant emotional injuries. Plaintiff has been traumatized, deprived of happiness and a feeling of security, and suffers daily from feelings of hopelessness and the inability to move on in her life from this tragic event.

163.    Plaintiff has been, and continues to be, treated for Post-Traumatic Stress Disorder. She suffers from panic attacks and high anxiety, and regularly seeks treatment with a mental health professional.

**Defendant Continues to Victimize Plaintiff**

164.    Following Defendant's unilateral decision to close out Plaintiff's Title IX Complaints and allow Assaulter Roe to withdraw without consequence, Defendant continued to victimize Plaintiff.

165.    Indeed, as Defendant was well aware, given the untenable environment and stress Plaintiff was under following the Assault, her grades declined and she eventually chose, for her own health and safety, to withdraw as a student on a medical leave.

166. In response, Defendant went after Plaintiff and on or about August 17, 2017, sent Plaintiff and her family correspondence advising that Defendant had withdrawn Plaintiff's scholarship.

167. Defendant demanded that, should Plaintiff wish to return as a student at HWS, Plaintiff pay her full tuition, without any scholarship or assistance.

168. Defendant did not give Plaintiff any explanation for its decision to rescind her scholarship in her absence after the Title IX process had concluded.

**CAUSES OF ACTION**
**AS AND FOR A FIRST CAUSE OF ACTION**
*(Discrimination in violation of Title IX: Hostile Education Environment - Sexually Hostile Culture)*

169. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

170. Defendant actively created and/or condoned and/or was deliberately indifferent to a culture of sexual hostility and violence against women by instituting policies and permitting practices that included, but were not limited to: (i) purposefully ignoring and/or delaying investigation(s) of complaints of sexual misconduct and rape perpetrated against its female students; (ii) failing to hold hearings within the manner and time frame proscribed by Title IX to the detriment of female complainants; and (iii) permitting male students accused of sexual misconduct to escape liability without adjudication.

171. Defendant's sexually hostile policies and practices were a proximate cause of Plaintiff subjection to months of sexual harassment in the form of (i) rape by one of HWS' upperclassmen; (ii) sexual assault and battery by one of Defendant's upperclassmen; (iii) a hostile educational environment; and (iv) ongoing and prolonged harassment by forcing Ms. Doe to interact with her assailant in her daily academic life.

172.    The sexual harassment that Plaintiff suffered was so severe, pervasive, and objectively offensive that it effectively barred her access to educational opportunities and benefits and, indeed, led to her withdrawal from Defendant.

173.    As a direct and proximate result of Defendant's creation of and deliberate indifference to its sexually hostile educational environment, Plaintiff suffered damages and injuries for which Defendant is liable.

## AS AND FOR A SECOND CAUSE OF ACTION
*(Gender Discrimination in violation of Title IX: Deliberate Indifference to Plaintiff's Rape)*

174.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

175.    Title IX prohibits federally-funded institutions such as Defendant from engaging in discrimination on the basis of sex. Sexual harassment is included within the meaning of "discrimination" under Title IX.

176.    Sexual harassment of a student creates a hostile environment if the conduct is sufficiently severe that it denies or limits a student's ability to participate in or benefit from educational programs. A single instance of rape is sufficiently severe to create a hostile education environment.

177.    Title IX requires universities to promptly investigate student complaints of sexual harassment, and to take interim measures to ensure that its students are not subjected to a hostile education environment. The failure to do so amounts to "deliberate indifference" for which Defendant may be held liable under Title IX.

178.    Defendant's own Title IX procedure states that, "the period from commencement of an investigation through resolution (finding and sanction, if any) will not exceed sixty (60) calendar days[.]"

179.   The Office of Civil Rights' guidelines provided that the entire investigation process, which includes conducting the fact-finding investigation, holding a hearing, and determining what actions the school will take to eliminate the hostile environment and prevent its recurrence, including imposing sanctions against the perpetrator and providing remedies for the complainant should be completed within sixty (60) days.

180.   Defendant was on notice and aware of Plaintiff's rape as well as the identity of Assaulter Roe as early as December 18, 2016.[3]

181.   Defendant deliberately chose not to investigate Assaulter Roe after learning about Plaintiff's rape and deliberately prolonged the investigative process in violation of the time frame mandated by Title IX.

182.   Defendant did not issue a preliminary investigative report until on or about April 10, 2017.

183.   Defendant failed to issue a final investigative report. Defendant further failed to hold a disciplinary hearing or make a final determination with respect to Plaintiff's Title IX Complaint. In doing so, Defendant permitted Assaulter Roe to withdraw from Defendant without consequence and without the proper notation on his academic record.

184.   Defendant's failure to investigate the assault, conduct a timely investigation, conduct any disciplinary proceedings, or properly note the allegations on Assaulter Roe's transcript was intentional and unreasonable.

185.   Defendant's actions, and lack thereof, constitutes "deliberate indifference" in violation of Title IX.

---

[3] Arguably, Defendant had notice of the Assault and Assaulter Roe's identity as early as November 2016, when Friend M.B. advised the Title IX Office of Plaintiff's rape.

186.     As a direct and proximate result of Defendant's deliberate indifference to Plaintiff's rape and Defendant's violations of Title IX, Plaintiff was exposed to continued stalking by Assaulter Roe, a second assault and battery by Assaulter Roe, and sexual harassment which was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff equal access to meaningful educational opportunities and benefits including, but not limited to, academics, on campus events and activities, and extracurricular activities.

187.     As a direct and proximate result of Defendant's deliberate indifference to Plaintiff's rape and Defendant's violations of Title IX, Plaintiff was subjected to a hostile education environment while attempting to pursue her education on Defendant's campus.

188.     As a direct and proximate result of Defendant's deliberate indifference to Plaintiff's rape and Defendant's violations of Title IX, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

189.     As a direct and proximate result of Defendant's deliberate indifference to Plaintiff's rape and Defendant's violations of Title IX, Plaintiff suffered damages and injuries for which Defendant is liable.

### AS AND FOR A THIRD CAUSE OF ACTION
*(Negligence)*

190.     Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

191.     Defendant owed a duty of reasonable care to protect Plaintiff from a sexually hostile environment which Defendant fostered and that was foreseeable.

192.     Defendant knew, or should have known, of the serious risk of sexual harassment and assault that was occurring on Defendant's campus(es), and knew or should have known of the risk of sexual violence toward their female students.

193.    The aforementioned sexually hostile policies of Defendant made the likelihood of sexual violence toward Defendant's female students foreseeable.

194.    Defendant breached its duty to Plaintiff through its aforementioned sexually discriminatory policies, practices, and actions, without any regard for the safety of women like Plaintiff at Defendant.

195.    As a direct and proximate result of Defendant's decision to adopt such policies and failure to prioritize the safety and security of its students, in particular its female students, Ms. Doe suffered damages and injuries for which Defendant is liable under New York State Common Law.

### AS AND FOR A FOURTH CAUSE OF ACTION
*(Intentional and/or Negligent Infliction of Emotional Distress)*

196.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

197.    At all times relevant herein, Defendant knew or should have known of its duty to protect Plaintiff from a sexually hostile environment. Further, at all times relevant herein, Defendant knew or should have known of its obligation to promptly and fully investigate and adjudicate all complaints of sexual misconduct under both federal and state law.

198.    Defendant intentionally failed to meet its obligations to promptly and fully investigate and adjudicate all complaints of sexual misconduct under both federal and state law when it intentionally delayed the investigation and adjudication of Plaintiff's Title IX Complaints, failed to hold any disciplinary hearing, and failed to properly discipline Assaulter Roe allowing him to escape liability.

199.    As a direct and foreseeable consequence of Defendant's actions, Plaintiff sustained tremendous damages, including, without limitation, severe emotional distress, loss of

educational and career opportunities, economic injuries, and other direct and consequential damages.

200.    The emotional distress was severe enough that it has resulted in illness and/or mental harm to Plaintiff.

201.    Plaintiff is regularly seeing a counselor and appears to be suffering from depression, anxiety, and post-traumatic stress disorder as a result of this experience. She was additionally forced to forfeit her level and quality of education as a result of Defendant's attack on her.

202.    Defendant's extreme and outrageous conduct was the cause of Plaintiff's distress.

203.    Considering the gravity and seriousness of Defendant's actions and/or inactions, Defendant should have recognized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm to Plaintiff.

204.    Plaintiff's distress is reasonable in light of Defendant's conduct.

205.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
*(Retaliation in Violation of Title IX)*

206.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

207.    Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) ("Title IX"), provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or
activity receiving Federal financial assistance.

208.    Title IX applies to an entire school or institution if any part of that school receives

federal funds even where there is very little direct federal funding of a particular department or

academic and/or extracurricular area.

209.    Both the Department of Education ("DOE") and the Department of Justice have

promulgated regulations under Title IX that require a school to "adopt and publish grievance

procedures providing for the prompt and equitable resolution of student…complaints alleging

any action which would be prohibited by" Title IX or the regulations thereunder.  34 C.F.R.

§ 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).

Such prohibited actions include all forms of sexual harassment, including sexual intercourse,

sexual assault, and rape. [4]

210.    The procedures adopted by a school covered by Title IX must not only "ensure

the Title IX rights of the complainant," but must also "accord[] due process to both parties

involved."[5]

211.    Pursuant to Title IX, a funding recipient may not retaliate against a person who

speaks out against gender discrimination and/or sexual assault.

212.    As set forth in detail above and herein, Defendant intentionally delayed Plaintiff's

Title IX Complaints, failed to timely and fully investigate and adjudicate Plaintiff's Title IX

Complaints despite due demand and, in fact, pleas from Plaintiff and her family to do so, and

subjected Plaintiff to a hostile educational environment.

---

[4] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 19-20, 21 & nn. 98-101.
[5] *Id.* at 22 (emphasis added).

213.    As set forth in detail above and herein, Plaintiff vehemently and repeatedly objected to Defendant's deficient investigation and adjudication of her Title IX Complaints and complained that she believed she was receiving unequal treatment vis-à-vis her male attacker, Assaulter Roe.

214.    As set forth in detail above and herein, Defendant, at all times, were aware of Plaintiff's complaints.

215.    As set forth in detail above and herein, instead of appropriately addressing Plaintiff's complaints, Defendant retaliated against Plaintiff by, among other things, allowing her male attacker to escape liability unscathed, and further stripped Plaintiff of her scholarship and demanded Plaintiff remit extensive payments to Defendant.

216.    Accordingly, Defendants retaliated against Plaintiff in violation of Title IX of the Education Amendments of 1972 and are liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
*(Breach of Implied and/or Express Contract)*

217.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

218.    Based on the aforementioned facts and circumstances, Defendant created express and implied contracts when Plaintiff was accepted as a student at HWS.  Plaintiff at all times was expected to adhere to Defendant's internal policies and procedures, and at all times did so adhere to such policies and procedures.

219.    In contrast, Defendant was required to adhere to and implement HWS' policies and procedures, including but not limited to the Policy and Procedures as outlined above.

220.    During the Title IX process, Defendant intentionally and repeatedly failed to abide by the Policy and code of Conduct to the direct detriment of Plaintiff, thus causing Plaintiff significant damages.

221.    Based on the foregoing facts and circumstances, Defendant breached its express and/or implied agreement(s) with Plaintiff and is liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff seeks a judgment against Defendant as follows:

(i)     An Order enjoining Defendant HWS, along with its agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent and/or remedy sexual harassment;

(ii)    Injunctive relief required Defendant HWS to redress its violations of Title IX, including: (1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual harassment policy; (2) distributing written policies to all students describing prohibited activities and conduct and the consequences for violations; (3) enforcing a "zero tolerance policy" under which there is punishment proportional to the offense and procedures set forth for the protection of victims of sexual violence on campus, including, but not limited to, eliminating the "Withdrawal Pending Outcome" section of Defendant's Procedures which mandates the conclusion of complaints of sexual violence on campus to be closed without complete and proper adjudication; (4) providing for

annual, independent review by outside reviewers of Defendant's compliance with sexual harassment policies and Title IX guidance;

(iii)   An award of damages against Defendant on Plaintiff's claims one through six, as outlined above, including, without limitation, reimbursement of and prepayment for all of Plaintiff's tuition or related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual assault; damages for deprivations of the equal access to the education benefits and opportunities provided by Defendant; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present, and future earnings an enjoyment of life in an amount to be determined at trial;

(iv)   Punitive and/or exemplary damages against Defendant;

(v)   Statutory pre- and post-judgment interest on all sums awarded;

(vi)   An award of costs and attorneys' fees; and

(vii)   Any other relief the Court finds just and proper.

**Dated: New York, New York**
**        October 18, 2017**


                    **NESENOFF & MILTENBERG, LLP**
                    **Attorneys for Plaintiff**


        **By:**   **/s/ Andrew Miltenberg**
                    **Andrew T. Miltenberg, Esq.**
                    **Stuart Bernstein, Esq.**
                    **Gabrielle M. Vinci, Esq. *(admission pending)***
                    **363 Seventh Avenue, Fifth Floor**
                    **New York, New York 10001**
                    **(212) 736-4500**